Filed 12/2/25  In re Ke.N. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Ke.N. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. T.N., Defendant and Appellant. | G065612 (Super. Ct. Nos. 25DP0120, 25DP0121) O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Daphne G. Sykes, Judge. Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian for Plaintiff and Respondent.

No appearance for the Minors.

\* \* \*

## INTRODUCTION

T.N. (Father) is the father of Ke.N. and Ka.N. (together, the Minors), who were taken into protective custody in January 2025. Father appeals from the jurisdiction and disposition orders, which declared the Minors to be dependent children of the court, removed the Minors from their parents' custody, and approved a case plan for T.N.

As to Father, jurisdiction was based on the juvenile court's findings of substantial risk of harm to the Minors because (1) Father and the Minors' mother (Mother) had engaged in continuous domestic violence, (2) Father "may have an unresolved substance abuse problem," (3) Father "may have unresolved mental health issues," and (4) Father "has a criminal history."

Father challenges the finding he may have an unresolved substance abuse problem and, in part, the finding he has a criminal history. He argues substantial evidence does not support the finding that he has a substance abuse problem and his criminal history related to drugs was too remote in time to pose a substantial risk of harm to the Minors. Father also challenges the component of his case plan directed to substance abuse treatment.

We conclude substantial evidence supports the juvenile court's finding to be true the allegation that the Minors are at risk of harm because Father may have an unresolved substance abuse issue. As a consequence, we affirm the jurisdiction and disposition orders without modification of Father's case plan.

2

## FACTS AND PROCEDURAL HISTORY

We limit our statement of facts and the procedural history to what is necessary to resolve the issues presented by this appeal.

### I.

### Juvenile Dependency Petition and Detention

Ke.N. was born in September 2018. Ka.N. was born in February 2020. Father and Mother are not married but lived together with Ke.N. and Ka.N.

On January 24, 2025, Mother struck Father by dropping a chair on him. Law enforcement was dispatched and Mother was arrested. Father bailed Mother out of jail because he "didn't want her family to look at me in a bad way."

Orange County Social Services Agency (SSA) investigated the matter and obtained a protective custody warrant. The warrant was executed, and the Minors were removed from the Father and Mother's custody on January 30, 2025.

On February 3, 2025, SSA filed a juvenile dependency petition alleging the Minors came within section 300, subdivision (b)(1). The petition alleged under allegations b-1 and b-2 that Mother and Father "engaged in domestic violence, which includes verbal and physical altercations in the presence of the children," and "Mother and [Father] are in a contentious relationship and argue daily." The petition alleged under allegation b–3 that Father "may have an unresolved substance abuse problem" and under allegation b–4 that Father "may have unresolved mental health issues." The petition also alleged under allegation b–6 that Father had a criminal history which included arrests or convictions for possession of a controlled substance, possession of a controlled substance for sale, infliction of corporal punishment

3

and battery against a spouse or cohabitant, violation of a court order to prevent domestic violence, stalking, theft and grand theft, robbery, and burglary.

At the detention hearing on February 4 and 5, 2025, the juvenile court found "there is a substantial danger to the physical health of the child and there are no reasonable means by which the child's physical or emotional health may be protected without removing the child from the parents' physical custody." The Minors were ordered to be detained and were placed at Orangewood Children's Home. The juvenile court issued a temporary restraining order against Mother. On May 29, 2025, the juvenile court issued a three–year restraining order against Father.

## II.

## Requests for Restraining Orders

On February 5, 2025, Father requested a restraining order protecting him and the Minors from Mother. The juvenile court issued a temporary restraining order against Mother but excluded from its scope Mother's visitation with the Minors and brief and peaceful contact to communicate about your children for court–ordered visits.

On April 29, 2025, Mother requested a restraining order protecting her from Father. Mother claimed that Father had posted a naked image of her on Facebook, harassed her with disparaging text messages and social media posts, locked Mother out of the home several times, and cut up Mother's clothing. The juvenile court issued a temporary restraining order against Father, which included an order that he move out of the home, and set a hearing date. On May 29, 2025, the juvenile court issued a three year restraining order against Father.

# III.

## Jurisdiction and Disposition Hearing

A contested jurisdiction and disposition hearing was conducted over six days, commencing on April 29, 2025 and concluding on May 29, 2025. Admitted into evidence were 14 photographs, SSA's jurisdiction/disposition report dated February 28, 2025 and addendum reports dated, respectively, April 29, May 19, and May 29, 2025. Father, Mother, and the assigned social worker testified.

A. *SSA Reports*

In an interview with the social worker, Father explained he had bailed Mother out of custody following the incident so that her family would not think poorly of him and because the Minors were asking for her. Father said he should have sought an emergency protective order, but that he has mental health issues and is easily overwhelmed.

Father denied having a substance abuse problem and insisted that his criminal history had been a misunderstanding and that they were "old charges." Father said his issue was not using substances, but that he had been "the person that sold drugs." Father explained that he had "worked hard to control and change the person [he] used to be." (CT 179.)

B. *Father's Testimony*

Father testified he had five children in total: Ke.N., Ka.N., and three others who were over the age of 18. Mother and Father were not married, and Father referred to Mother as "baby-momma." Before their removal, Ke.N. and Ka.N. lived in a home with both Father and Mother.

On January 24, 2025—the day on which Mother dropped the chair on Father—Father arrived home at about 6:00 p.m. to find Mother not there and the Minors home alone. Father took the Minors to a police station

and made a report so that the incident would be documented. The police told Father to return home and an officer would be sent there to make a report. Mother was at home when Father and the Minors returned. Father was silent but Mother became loud and escalated the situation. Father went to his bedroom and sat at his desk. Mother took a stool from the kitchen and shoved it against Father's head. Father laughed because he thought this was a joke and he did not want the Minors to become upset.

It was possible that the Minors, who were playing and watching television in Father's bedroom, saw Mother shove the stool against Father, but Father was not sure. Father livestreamed the altercation with Mother on Facebook so that her "singing friend" could see what was going on.

Father contacted police dispatch, and a police officer soon arrived at the house. Mother was arrested and taken into custody. Father bailed Mother out of jail because the Minors wanted her to come home.

The incident with the stool was the first time Mother had struck Father. When Mother argued with him, Father would walk away and stay quiet to avoid "escalating" the situation. Mother would break things when she did not get what she wanted. Once when Mother was angry, she broke a planter that Father had made for the Minors.

Without Father's permission, Mother took clothing belonging to Father that he offered for sale at swap meets and wore the clothing when she went out singing. Father cut up the clothes because he did not want Mother wearing clothing belonging to him.

In 1998, Father's sister, brother, and a friend died in a car accident in front of Father. Father went "crazy" and was hospitalized. Father had been diagnosed by a physician with anxiety and depression. After his wife died of cancer, Father was depressed and suicidal. When asked if he had

any current mental health diagnosis, Father replied that "right now" he was not "mental." He knew he was "mental" when he needed to take medication.

Father would burn his hand with a cigarette whenever he missed the Minors, was depressed, or had a breakdown. The most recent time he burned his hand was a couple of days before testifying. Sometimes he would livestream himself burning his hand so people could see "how painful I am missing my kid." Father had received therapy for his self–harming behavior, but the therapy did not work.

Father testified he had stopped drinking alcohol when Ke.N. was born. Before Ke.N. was born, he supplied drugs, but did not use them. He has never used drugs or been under the influence when around the Minors. He had participated in a drug treatment program, as well as therapy and counseling, when he was released from prison in 2017.

C. *Social Worker's Testimony*

Senior Social Worker Porschia Meyers (Meyers) had been assigned to this case since the beginning of February 2025. SSA's recommendation was to provide family reunification services to both Mother and Father.

Meyers recommended section 730 evaluations for both Mother and Father because SSA was concerned about their mental health. Meyers was concerned that Father had posted content on social media that was "just very alarming," such as videos of Father inflicting self–harm and conversations about suicide. The Minors should not be returned to Father's care because Meyers was concerned over Father's "fragile" mental health, his self–harming behavior, and his commentaries of wanting to commit suicide and "hurt all parties involved." In addition, Father expressed his feelings and

displayed the burn mark on his hands to the Minors, who reportedly would console Father.

Father had been sent referrals from SSA but had not engaged in any services and had stated he would not engage in services until he was ordered to do so. Father's home was "hoarded" and had materials that were unsafe for the Minors. Meyers believed that Father's Facebook posts were indicative of an aggressor rather than the victim of domestic violence.

D. *Mother's Testimony*

Father had been trying to get her to stop her work as a singer. The clothing that Father had cut up was her property. He cut up at least 150 articles of clothing. Father kept the clothing he sold at the swap meet in a "cargo car."

Father locked Mother outside of the home in March or April 2025. Once Father nailed a door shut in order to protect "his loved ones." Mother believed Father acted in "protection mode" because it gave him a sense of security and control over "his woman."

Mother testified that she had never been violent with Father. However, she invoked her Fifth Amendment right not to testify in response to a question regarding the incident in which she hit Father with a stool.

Mother testified that Father had pinned her down on the floor in order to take her cell phone. Father had taken Mother's cell phone away from her on more than one occasion.

Father would manipulate Mother by using a situation or something she cared about to trigger an emotional reaction. Mother would respond by walking away or busying herself with the Minors. Mother called Father "a pathetic guy."

E. *The Juvenile Court's Ruling*

The juvenile court sustained the dependency petition and found its allegations (with one modification) to be true by a preponderance of the evidence. The court found the best interests of the Minors would be served by removing them from Father and Mother's custody and by vesting custody with SSA.

The juvenile court ordered reunification services for Father and Mother. The court approved the case plan from SSA's jurisdiction/disposition report with the addition that Father and Mother submit to an expert evaluation under Evidence Code section 730. That case plan required Father to submit to random drug and alcohol testing with an observed specimen collection upon suspicion as deemed appropriate by SSA. If Father tested positive for substances or alcohol, missed a test, or had a diluted test, he would be referred to a treatment program and self–help meetings. An outpatient substance abuse treatment program and a 12–step program were also listed as separate components of Father's case plan. Father's case plan also included participation and completion of a personal empowerment program which included the issue of the role of alcohol and drugs.

## DISCUSSION

Father challenges the juvenile court's finding that jurisdictional allegation b–3 was true by a preponderance of the evidence. Allegation b–3 alleged the Minors were at risk of harm because Father "*may* have an unresolved substance abuse problem." Father also challenges, in part, the juvenile court's finding that allegation b–6 was true by a preponderance of the evidence. Allegation b–6 alleged the Minors were at risk of harm due to Father's criminal history. Father contends that allegation is not true with respect to his criminal history involving drugs.

9

Father does not challenge juvenile court jurisdiction based on allegations that Father and Mother engaged in domestic violence, Father may have unresolved mental health issues, and Father has a criminal history outside of drug-related charges. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Father's appeal is not moot, however, because the challenged jurisdictional findings serve as the basis for dispositional orders—most notably that Father submit to drug testing—that are also challenged on appeal. (*In re D.P.* (2023) 14 Cal.5th 266, 283; *In re S.F.* (2023) 91 Cal.App.5th 696, 712 (*S.F.*).)

When the sufficiency of the evidence supporting the jurisdictional findings and disposition is challenged, we must determine whether substantial evidence, contradicted or uncontradicted, supports the findings. (*S.F., supra*, 91 Cal.App.5th at p. 713.) In making that determination, we review the record in the light most favorable to the juvenile court's findings. (*Ibid.*) We resolve all conflicts in the evidence and draw all reasonable inferences in favor of the findings. We do not weigh evidence or assess witness credibility. (*Ibid.*) Substantial evidence does not mean any evidence; to be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value. (*Ibid.*)

10

Father argues that neither the assigned social worker nor Mother testified that Father ever used drugs or alcohol. Father testified he had stopped drinking beer when Ke.N. was born in September 2018. Father testified that before Ke.N. was born, he supplied drugs in order to support his older children, but never used drugs. He has never used drugs or been under the influence when around the Minors.

During closing argument, SSA's counsel never mentioned or addressed any evidence that Father may have a substance abuse problem. In rendering its decision, the juvenile court expressed concern over Father's "self–harm and angst" and ordered him to follow the recommendations made by the expert who was to conduct the section 730 evaluation, but said nothing about substance abuse other than to sustain the allegation the Father may have an unresolved substance abuse issue.

We acknowledge this state of the record but conclude nonetheless that substantial evidence supports the finding that Father may have an unresolved substance abuse problem. Our conclusion rests on three factors. The first factor is the juvenile court's implied finding that Father was not credible in testifying that he never used drugs, and had stopped selling drugs and drinking beer when Ke.N. was born. (*Gee v. Greyhound Lines, Inc.* (2016) 6 Cal.App.5th 477, 492 ["we defer to the trial court's implied finding of credibility and reject [plaintiff's] apparent attempt to encourage us to make a different credibility determination"].)

Father's lack of credibility must be considered in light of the second factor upon which our conclusion rests—Father's lengthy criminal history, which included arrests and convictions for both possession and possession for sale of controlled substances. In 2000, Father pleaded guilty to one count of possession of a controlled substance. In 2005, he pleaded guilty

11

to four counts of sale or transport of a controlled substance, and in 2011 pleaded guilty to one count of sale or transport of a controlled substance. In February 2015, Father was arrested for possession of a controlled substance (methamphetamine). He pleaded guilty to that charge in July 2017 and was sentenced to 60 days in jail.

The convictions from 2000 to 2017 arguably are too far in the past to be indicative in themselves of whether Father had a substance abuse problem in 2025. But in July 2021, Father was again arrested for possession of a controlled substance. (Health & Saf. Code, § 11377, subd. (a)). He pleaded guilty to those charges in January 2025. The conviction in 2025 was for possession, not possession for sale, and shows Father's involvement with drugs did not end, as he claimed, when Ke.N. was born in 2018. If Father's testimony that he ceased selling drugs when Ke.N. was born was true, then Father's possession of drugs in 2021 would have been for his own use.

Father claims he was found not guilty of possession of a controlled substance charge from 2021. But in support of that claim he cites to a summary of his criminal history which indicates only that he pleaded not guilty. That summary was attached to SSA's application for a protective custody warrant that was filed on January 20, 2025. SSA's jurisdictional/dispositional report dated February 28, 2025 includes a summary of Father's criminal record which indicates that in January 2025 Father pleaded guilty to the 2021 possession of a controlled substance charge.

The third factor is the evidence of Father's erratic and strange behavior, which includes infliction of self–harm. Father concedes he suffers from mental health issues that affect his behavior. Based on Father's history of involvement with controlled substances, including the recent conviction for possession, it is reasonable to infer that an unresolved substance abuse

12

problem might be contributing to Father's behavior or that such behavior was symptomatic at least in part of a substance abuse issue.

Because we uphold the true finding on allegation b–3, we reject Father's contention his case plan must be modified to eliminate drug testing and other elements of substance abuse treatment.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

SANCHEZ, J.

WE CONCUR:

MOORE, ACTING P. J.

SCOTT, J.

13